UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__09/18/2018__

Crystal La-Chan Hill,

                              Plaintiff,

            -against-

Nancy A. Berryhill,

                              Defendant.

1:17-cv-02090 (SDA)

**OPINION AND ORDER**

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE.**

Plaintiff Crystal La-Chan Hill ("Plaintiff" or "Hill") brings this action pursuant to § 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security ("Commissioner"), denying her application for Supplemental Security Income ("SSI").[1] (Am. Compl., ECF No. 9.) Presently before the Court is Hill's motion for judgment on the pleadings (ECF No. 16) and the Commissioner's motion for judgment on the pleadings (ECF No. 21), both pursuant to Fed. R. Civ. P. 12(c).

For the reasons set forth in this Opinion and Order, the Commissioner's motion is GRANTED and Hill's motion is DENIED.

---

[1] On January 18, 2017, the Social Security Administration ("SSA") promulgated a final rule that dramatically changes the nature of the evaluation of medical opinion evidence. Revisions to Rules Regarding the Evaluation of Medical Opinion Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017) (codified at 20 C.F.R. §§ 404 & 416). These new regulations apply only to claims filed with the SSA on or after March 27, 2017. Accordingly, because Plaintiff's claims were filed before this date, to the extent that the Social Security regulations are cited in this Opinion and Order, the Court is referring to the version of the regulations effective before March 27, 2017.

**BACKGROUND**

### I.     Procedural Background

Hill filed her application for SSI on December 9, 2013, alleging a disability onset date of January 1, 2009. (Administrative R. ("R.") 163-64.) The claim was denied on April 10, 2014. (R. 104-15.) On May 1, 2014, she requested a hearing. (R. 116.) On September 11, 2015, Hill appeared with counsel for a hearing before Administrative Law Judge ("ALJ") Kieran McCormack ("McCormack") (R. 47), who denied Hill's application for benefits on September 22, 2015. (R. 14.) ALJ McCormack's decision became the Commissioner's final decision when the Appeals Council denied review on January 24, 2017. (R. 1.) This action followed.[2]

Born on May 27, 1969, Hill was forty-four years old when she applied for SSI, and forty-six years old on the date of her hearing before ALJ McCormack. (R. 64.)

### II.     Medical Evidence

In her application to the SSA, Hill alleged she was disabled due to coronary artery disease, high blood pressure, high cholesterol, asthma and heart condition. (R. 182.)

The medical record consists of examination reports from Hill's primary care physician, Dr. Richard Khalil; consultative reports from Dr. Catherine Pelczar-Wissner and Dr. Julia Kaci; and various test results.

---

[2] Hill applied for SSI in a separate application filed on March 24, 2011, prior to her application filed on December 9, 2013. (R. 78.) In connection with that application, Hill appeared for a hearing on May 31, 2012 before ALJ Dennis Katz ("Katz"). (R. 27-44.) ALJ Katz denied her application on July 19, 2012 (R. 75), and the Appeals Council denied review of ALJ Katz's decision on August 27, 2013. (R. 90.) That earlier decision is not at issue before me.

## A. Records From Broadway Medical Services

Hill visited Broadway Medical Services for treatment from 2012 to 2014.[3] A physical examination on July 25, 2012 revealed she had left shoulder pain when lifting and moving the shoulder. (R. 288.) Her body mass index ("BMI") was 30. (*Id.*)

A progress follow-up note dated August 20, 2012 mentioned Hill's asthma, but made no other mention of lung or heart issues. (R. 287.) Her BMI was 30. (*Id.*) A progress follow-up note dated October 18, 2012 again mentioned Hill's asthma and chest, and indicated Hill was counseled for smoking cessation. (R. 286.) Hill's asthma was not mentioned in progress follow-up notes during her visits on March 9, 2013 (R. 285) or May 11, 2013 (R. 284), but was mentioned again on June 22, 2013 (R. 283) and June 26, 2013. (R. 282.)

On July 23, 2013, Hill returned to Broadway Medical Services, this time complaining of right-sided chest pain and bilateral lower extremity pain, which she rated at a 10/10 at times. (R. 280.) She was sent for vascular[4] testing to rule out peripheral vascular disease, and given Coumadin[5] to treat her symptoms. (*Id.*) Regarding her coronary artery disease, there was no change after her coronary artery bypass graft. (*Id.*) The progress note from her next visit, on

---

[3] The physician signatures on the hard copies of Hill's medical records from Broadway Medical Services are illegible (R. 272-88); however, the electronic copies of those records are from Dr. Khalil at Broadway Medical Services. (*See* R. 309-24.)

[4] Vascular is defined as "pertaining to vessels, particularly blood vessels." *Dorland's Illustrated Medical Dictionary* 2026 (32nd ed. 2012).

[5] Coumadin is used to treat blood clots. *See* http://www.coumadin.bmscustomerconnect.com/.

August 26, 2013, corrects that note to read instead that there was no change to her coronary artery disease after her valve replacement.[6] (R. 279.)

Hill returned to Broadway Medical Services again on August 30, 2013 for a follow-up visit and to obtain test results. (R. 278.) A progress note from this visit mentioned her high blood pressure, tobacco usage and past heart surgery, and that she had a past surgical procedure: a valve replacement of the mitral[7] and aortic[8] valves.[9] Her progress notes from her next visits on September 18, October 22 and November 21 also reference her coronary artery disease and Coumadin medication. (R. 275-77.)

On December 20, 2013, Hill returned to Broadway Medical Services, complaining of sinus pains, coughing and sneezing. (R. 274.) Her physical exam notes mention acute sinusitis[10] and her valve replacement. Dr. Khalil prescribed her an inhaler. (R. 324.)

On January 16, 2014, Hill returned to Dr. Khalil at Broadway Medical Services. (*Id*.) He noted her neck and back pain, the fact that she was taking Coumadin and her valve replacement. He stated Hill "needs physical therapy." (*Id.*)

---

[6] The medical record evidence does not contain an actual record (*e.g.*, operation report) of Hill's surgery, which ALJ McCormack noted at the hearing. (R. 51, 63.) Hill's attorney at the hearing said that the surgery occurred in 2013. (R. 51.)

[7] Mitral pertains "to the left atrioventricular valve." *See Dorland's Illustrated Medical Dictionary* 1170 (32nd ed. 2012).

[8] Aortic is the adjective form of "aorta," which "arises from the left ventricle of the heart . . . ." *Dorland's Illustrated Medical Dictionary* 112 (32nd ed. 2012).

[9] A valve is "a membranous fold in a canal or passage that prevents reflux of the contents passing through it." *Dorland's Illustrated Medical Dictionary* 2021 (32nd ed. 2012).

[10] Sinusitis is defined as "inflammation of a sinus, usually a paranasal sinus; it may be . . . acute or chronic." *Dorland's Illustrated Medical Dictionary* 1722 (32nd ed. 2012).

During a physical exam and review of systems dated February 19, 2014 (the same day that he completed a Residual Functional Capacity ("RFC") questionnaire for Hill, *see infra* Section II(A)(1)), Dr. Khalil reported that Hill was "well developed, well nourished, alert and cooperative, and appears to be in no acute distress." (R. 322.) In addition, Hill's lungs were "clear . . . without rales,[11] rhonchi,[12] wheezing or diminished breath sounds." (*Id.*) Her gait was normal. (*Id.*)

On February 21, 2014, Dr. Khalil prescribed Hill an inhaler (Proair). (R. 323.) Treatment plan notes from March 25, 2014 reflect Hill's valve replacement. (R. 318.) Since coronary artery disease was not detected in Hill, aspirin was not indicated, but the note indicated that the physician would "check cardio" to see if aspirin was needed. (*Id.*)

On April 25, 2014, Hill presented with diabetes mellitus, described as "new." (*Id.*) The treatment notes also mentioned asthma, with no change to her coronary artery disease. On August 28, 2014, Dr. Khalil's notes reflect her coronary artery disease and valve replacement. Her diabetes remained unchanged. (R. 316.)

A plan note dated October 15, 2014 stated "disability forms filled, needs more consistent visits" and included referrals to a cardiologist and neurologist. (R. 316.) On November 3, 2014, her hypertension was described as having "no change." (R. 315.) On December 30, 2014, a treatment note indicated there was no change after a stent placement, and that Hill was counseled on healthy lifestyle and eating habits.

---

[11] A rale is defined as "a discontinuous sound consisting of a series of short nonmusical noises, heard primarily during inhalation." *Dorland's Illustrated Medical Dictionary* 1576 (32nd ed. 2012).

[12] Rhonchi are "continuous sound[s] consisting of a dry, low-pitched, snore-liked noise, produced in the throat or bronchial tube due to a partial obstruction such as by secretions." *Dorland's Illustrated Medical Dictionary* 1642 (32nd ed. 2012).

Test results ordered by Dr. Khalil and reported on January 2, 2015 showed a decreased risk of diabetes, based on Hill's hemoglobin levels. (R. 307.) Tests to evaluate Hill's blood clotting time were reported on January 30, March 10, March 24, April 9 and May 17, 2015. (R. 301-05.) Her test results consistently showed that a standard dose of oral anticoagulant, which she was already taking (Coumadin) was appropriate. (*Id.*)

In March 2015, Hill reported chest pain and scattered wheezing, and her hypertension was described as "elevated at home." (R. 312-13.) On March 23, 2015, Hill had chest pain and scattered wheezing, and was referred to a cardiologist. (*Id.*)

On April 8, 2015, Hill was "told [to] call tomorrow for adjustment" to her valve replacement. (R. 312.) She reported headache and occasional dizziness. (*Id.*)

Other pulmonary function tests (including spirometry[13] testing) were performed while Hill was under Dr. Khalil's care, but the date of these tests is unknown. (R. 320.) The tests indicated "moderate obstructive lung defect" and "decrease in flow rate." The test results show a diagnosis of asthma. (*Id.*)

1. **Dr. Khalil's First RFC Questionnaire**

On February 19, 2014, Dr. Khalil completed a RFC Questionnaire regarding Hill.[14] (R. 255-57, 291.) Dr. Khalil said that Hill's fatigue was severe enough to constantly interfere with the attention and concentration required to perform simple work-related tasks. (R. 255.) In addition, he said Hill would need to recline or lie down in excess of the typical fifteen-minute morning and

---

[13] Spirometry is defined as "the measurement of the breathing capability of the lungs, such as in pulmonary function tests." *Dorland's Illustrated Medical Dictionary* 1751 (32nd ed. 2012).

[14] Dr. Khalil's office treatment records for that day include a note about "disability forms." (R. 324.)

afternoon breaks and thirty-to-sixty-minute lunch break during a hypothetical eight-hour workday. (*Id.*) He also stated Hill would not need a job permitting at-will shifting positions from sitting, standing or walking. (*Id.*) Dr. Khalil said that Hill could walk two city blocks without rest or significant pain, and sit for six hours and stand or walk for one hour in an eight-hour workday. (*Id.*) He further said that Hill would need to irregularly take five-minute unscheduled breaks in an eight-hour workday. (*Id.*) Regarding lifting, Dr. Khalil reported Hill could frequently lift up to ten pounds and occasionally lift twenty to thirty pounds. (R. 256.)

### 2. Dr. Khalil's Second RFC Questionnaire

On May 16, 2014, approximately three months after completing the first RFC Questionnaire, Dr. Khalil completed a second RFC questionnaire for Hill. (R. 268-69.) His findings on the second questionnaire were largely consistent with those in the first questionnaire.

On the questionnaire, Dr. Khalil listed fatigue and valve replacement as Hill's diagnosis. (R. 268.) He identified Hill's symptoms as dizziness, weakness and easy fatigue. (*Id.*) Regarding Hill's physical limitations, Dr. Khalil reported Hill could walk two city blocks without rest or significant pain, that she could walk or stand for ten minutes and sit for sixty minutes without pain, and that she could sit for six hours and stand or walk for one hour in an eight-hour workday. (*Id.*) He reported Hill would "frequently" need to take five-minute unscheduled breaks during an eight-hour workday. (*Id.*) Regarding Hill's lifting capabilities, Dr. Khalil reported she could occasionally lift ten to twenty pounds, and had no limitations doing repetitive reaching, handling or fingering. (R. 269.) Inconsistent with the prior RFC questionnaire, Dr. Khalil said that Hill would not need to recline or lie down during a hypothetical eight-hour workday in excess of the typical fifteen-minute morning and afternoon breaks, and thirty-to-sixty-minute lunch break. (R. 268.)

He stated that Hill is likely to be absent from work as a result from her impairment or treatments more than four times per month. (R. 269.)

In both questionnaires, he ultimately opined that Hill was not "physically capable of working an 8 hour day, 5 days a week employment on a sustained basis." (R. 256, 269.)

## B. Consultative Examinations

### 1. Dr. Pelczar-Wissner

On March 11, 2014, Hill visited Dr. Catherine Pelczar-Wissner for a consultative internal medicine examination. (R. 258-62.) The doctor's report noted Hill had a mitral valve replacement with a mechanical valve in February 2013 and "still feels very short of breath." (R. 258.) Dr. Pelczar-Wissner said Hill's asthma "is not under good control. She wheezes every day." (*Id.*)

Dr. Pelczar-Wissner reported Hill appeared to be in no acute distress; Hill had a normal gait and could walk one to two steps on heels and toes. (R. 259.) Hill could complete a one-quarter squat, used no assistive devices and did not need help changing or getting on and off the exam table. (*Id.*) Further, Hill was able to rise from a chair without difficulty. (*Id.*)

According to Dr. Pelczar-Wissner's report, Hill's extremities were normal (and her strength was measured at 5/5 in both the lower and upper extremities), there was "no muscle atrophy evident," and Hill's "[h]and and finger dexterity [was] intact" with bilateral grip strength of 5/5. (R. 260.) When evaluating Hill's musculoskeletal system, Dr. Pelczar-Wissner reported "[f]ull ROM[15] of shoulders, elbows, forearms, and wrists bilaterally. Full ROM of hips, knees, and ankles bilaterally. [. . .] Joints stable and nontender. No redness, heat, swelling, or effusion." (*Id.*)

---

[15] Range of motion.

When examining Hill's heart, Dr. Pelczar-Wissner observed a regular heart rate with no audible

murmur, gallop[16] or rub. (*Id.*) Regarding Hill's chest and lungs, Dr. Pelczar-Wissner observed

"some inspiratory[17]/expiratory[18] wheezing with good airflow." (*Id.*) Dr. Pelczar-Wissner noted

that Hill smokes half a pack of cigarettes per day and drinks socially only. (R. 259.)

Ultimately, Dr. Pelczar-Wissner concluded:

[Hill] has a marked restriction for exertional activities. She should not be doing any prolonged standing or bending. She should not be climbing stairs on a routine basis or doing any type of activity that would increase her dyspnea[19] or exertion. She should be referred for cardiac rehab. She should be sent to a nutritionist in order to help her lose weight. She should be sent to pulmonary in order to optimize her regimen, as she states she wheezes every day.

(R. 261.)

## 2. **Dr. Kaci**

On March 31, 2014, Hill saw Dr. Julia Kaci for a consultative examination consisting of Pre-

Pulmonary Function Tests.[20] (R. 263-66.) Dr. Kaci indicated that wheezing was not present when

listening to Hill's chest, and Hill was not in acute respiratory distress. (R. 264.) Dr. Kaci noted that

the results indicate "possible restrictive lung disease." (R. 263.) The test results also showed that

Hill was able to understand the directions for performing the tests and was cooperative. (R. 264).

---

[16] A gallop is "a disordered rhythm of the heart." *Dorland's Illustrated Medical Dictionary* 756 (32nd ed. 2012).

[17] Inspiratory pertains to inhalation. *See Dorland's Illustrated Medical Dictionary* 944 (32nd ed. 2012).

[18] Expiratory pertains to exhalation. *Dorland's Illustrated Medical Dictionary* 661 (32nd ed. 2012).

[19] Dyspnea is defined as "breathlessness or shortness of breath; difficult or labored respiration." *Dorland's Illustrated Medical Dictionary* 582 (32nd ed. 2012).

[20] Hill's test results were as follows: Forced Vital Capacity ("FVC") predicted 2.47, premed 1.55 which is 63% of predicted; Forced Expiratory Volume ("$FEV_1$") predicted 2.03, premed 1.25 which is 62% of predicted. (R. 263.) In this context, the term "premed" likely means "premedication," which is defined as "preliminary administration of a drug preceding a diagnostic, therapeutic, or surgical procedure, as an antibiotic or antianxiety agent." *Dorland's Illustrated Medical Dictionary* 1510 (32nd ed. 2012).

### C. Sudomotor Testing

Dr. Marc Sherman performed sudomotor[21] testing on Hill on May 16, 2014. (R. 294.) The testing showed "significant" damage to nerve fibers (so-called "C-fibers") in her hands and feet. (*Id.*) Dr. Sherman suggested that consideration be given for "mechanical injury to nerves, carpal tunnel or inherited traits that make more susceptibility to injury" and "exposure" to toxins (due to her alcohol and smoking consumption) and other infections. He also recommended a neurological evaluation for possible peripheral neuropathy and clinical correlation. (*Id.*)

### III. Non-Medical Evidence

On January 23, 2014, Hill submitted a Function Report (also known as an Activities of Daily Living report) to the SSA. (R. 206-15.) She stated she could get dressed, shower, do her hair, shave, feed herself and use the restroom. (R. 208.) She stated she cooks twice a week but needs to keep sitting down when she does so due to dizziness; her husband or her kids sometimes help prepare her meals. (R. 208-09.) She described her daily activities as sitting on her bed, doing her daughter's hair, helping her daughter get dressed and sweeping. (R. 207.) Hill stated her daily hobbies include reading, watching TV, using the computer and playing cards. (R. 210.) While she "do[es] what [she] can," she needs help with cleaning, laundry and house repairs. (R. 209.)

Hill said that she only went out when necessary (about once per month), to go grocery shopping for an hour. (R. 209-10.) She is able to pay her bills online and count change. (R. 208.) Regarding social activities, Hill said that, every day, she speaks on the phone with or receives

---

[21] Sudomotor is defined as "stimulating the sweat glands." *Dorland's Illustrated Medical Dictionary* 1796 (32nd ed. 2012). "Sudomotor testing evaluates for autonomic nervous system disorders, peripheral neuropathies, and some types of pain disorders." (Def.'s Mem. of Law, ECF No. 22 at n. 4 (citation omitted).)

visits from others, and she goes to church every Sunday. (R. 211.)

When asked about her abilities, Hill stated that she could see, hear and talk, but could not lift, kneel, squat and reach. (R. 211-12.) Additionally, Hill stated she could not spend long periods of time standing, walking and climbing. (*Id.*) In particular, Hill stated that she could walk three blocks before needing to stop and rest for five minutes. (R. 213.) She said that she uses a cane.[22] (R. 212.) Hill said that she sometimes, but not often, gets asthma attacks when she walks, but also said that her asthma has decreased. (R. 214.) Hill said she uses her inhaler to treat her asthma symptoms. (*Id.*)

Hill said she sometimes has trouble remembering things, but does not have problems paying attention or following spoken and written instructions. (R. 213-14.) Additionally, Hill said that she has problems with people in authority, but has never lost a job because of problems with getting along with people. (R. 213.)

## IV. **Hearing Before ALJ**

### A. **Hill's Testimony**

Hill appeared with counsel at the hearing before ALJ McCormack on September 11, 2015. (R. 47.) She explained she experiences hypertension, dizziness and trouble breathing (especially at night, when she has asthma attacks). (R. 52-54.) Although she testified about experiencing asthma attacks, she has never gone to the emergency room for them. (R. 54-55.)

Hill testified that, although she spends a lot of time in bed, she does bathe and dress herself. (R. 58.) Regarding chores, when asked by ALJ McCormack whether she could clean a room

---

[22] At her hearing before ALJ McCormack, Hill clarified that, although she uses a cane, it is not prescribed by a doctor. (R. 63.) She explained she has been using the cane on and off since her heart surgery for when she has "bad days." (*Id.*)

"in one-shot," Hill answered that she could complete half of a room. (R. 59.) Hill explained she cannot tolerate aerosols, sprays, cleaners or detergents of any sort, saying that some give her headaches, make her dizzy and cause her to not breathe. (R. 60.) Hill also testified that her husband cooks dinner for her about three days per week. (R. 61.) She stated she is able to climb two flights of stairs to get to her apartment, but she has to stop after every two steps. (R. 62.)

### B. Vocational Expert Testimony

Vocational expert Helene Feldman ("Feldman"), also testified at the hearing.[23] Feldman testified that Hill: could perform sedentary work, but could not climb ladders, ropes or scaffolds, and could not crawl; could occasionally push, pull, climb, ramps and stairs, balance, stoop, kneel and crouch; and could not work in jobs containing even moderate exposure to airborne irritants such as fumes, odors, dust, gasses and/or smoke. (R. 65-67.) Feldman testified that Hill could perform approximately 1,788,390 jobs in the national economy, including, *e.g.*, hand suture winder, document preparer, paper weight tester and office helper. (R. 64-65.)

ALJ McCormack asked Feldman various hypotheticals about the types of jobs an employee with Hill's limitations could perform. (R. 64-71.) Each time, ALJ McCormack altered the hypothetical to be more or less restrictive, based on physical abilities. Feldman answered the hypotheticals by naming the jobs in the national economy available to an individual who possessed the work limitations as provided in the hypotheticals. (*Id.*) ALJ McCormack perceived an inconsistency in Feldman's testimony when Feldman listed a higher number of job possibilities for a hypothetical which included greater physical restrictions. (R. 66-72.) He asked Feldman

---

[23] Feldman has been an Employee Assistance Professional since September 2001, and previously she served as a Vocational Rehabilitation Counselor for over a decade. (R. 243-44.)

numerous follow-up questions about this inconsistency, and Feldman clarified that the positions available to the hypothetical with less physical restrictions would include greater exposure to irritants, which explained the reduced availability of positions. (R. 72.)

## V.  ALJ Decision

ALJ McCormack found at step one that Hill had not engaged in substantial gainful activity since applying for benefits on December 9, 2013. (R. 16.) At step two, ALJ McCormack found that Hill had three severe impairments: status post mitral valve replacement surgery, hypertension and asthma. (*Id.*) At step three, ALJ McCormack found that Hill's severe impairments did not meet or medically equal the severity of any listed impairments. (R. 17.)

Next, ALJ McCormack calculated Hill's RFC. He found that Hill could perform sedentary work, except that she cannot crawl or climb ladders, ropes or scaffolds. (R. 17.) He further found that Hill "can push/pull, climb ramps and stairs, balance, stoop, kneel and crouch on an occasional basis," and he found that Hill "is unable to work at jobs containing even moderate exposure to airborne irritants such as fumes, odors, dust, gases or smoke." (*Id.*)

At step four, ALJ McCormack found that Hill had no past relevant work experience to consider. (R. 20.) Thus, the ALJ proceeded to the fifth and final step, wherein he found that jobs existing in significant numbers in the national economy are available to Hill considering her "age, education, work experience and residual functional capacity." (*Id.*) At this step, the ALJ relied on the Feldman's testimony, which found that Hill could perform certain representative occupations in the national economy. (R. 21.) ALJ McCormack found Feldman's testimony to be consistent with the Dictionary of Occupational Titles. (R. 21.) As part of his step five analysis, the ALJ noted that Hill was a "younger individual age 18-44" on the date she applied for benefits. (R. 20.) The

ALJ therefore found that hill was not disabled, as defined by the SSA, since the date she filed her application.

Further, ALJ McCormack gave "[c]onsideration" to Hill's "subjective complaints," but also found that the medical evidence did not "substantiate the allegations of the claimant to the degree alleged." (R. 18-19.) In reaching this conclusion, he found that, although Hill's impairments could reasonably cause the alleged symptoms, "the findings contained in the medical evidence do not demonstrate that the severity of [her] symptoms are disabling under the Social Security Act . . . ." (R. 17.)

**DISCUSSION**

I.     <u>**Legal Standards**</u>

    A.  <u>**Standard Of Review**</u>

A motion for judgment on the pleadings should be granted if it is clear from the pleadings that "the moving party is entitled to judgment as a matter of law." *Burns Int'l Sec. Servs., Inc. v. Int'l Union*, 47 F.3d 14, 16 (2d Cir. 1995). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence." *Ulloa v. Colvin*, Case No. 13-CV-4518 (ER), 2015 WL 110079, at *6 (S.D.N.Y. Jan. 7, 2015) (citing *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir.1999)); *see also Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir.1987)). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough

to overturn the ALJ's decision[.]" *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009); *accord Johnson*, 817 F.2d at 986. The Court, however, will not defer to the Commissioner's determination if it is the product of legal error. *See Douglass v. Astrue*, 496 F. App'x 154, 156 (2d Cir. 2012).

Absent legal error, an ALJ's determination may only be set aside if it is not supported by substantial evidence. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (citing *Balsamo v. Chater*, 142 F. 3d 75, 79 (2d Cir. 1998)) (vacating and remanding ALJ's decision). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. *See Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir. 1995).

### B. <u>Determination Of Disability</u>

A person is considered disabled for benefits purposes when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In determining whether an individual is disabled, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 416.909, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 416.920.

The claimant bears the burden of proof as to the first four steps. *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999). It is only after the claimant proves she cannot return to work that the

burden shifts to the Commissioner to show, at step five, that other work exists in the national economy that the claimant can perform, given her residual functional capacity, age, education and past relevant work experience. *Id*. at 51.

For purposes of evaluating disability, claimants between the ages of forty-five to forty-nine are considered "younger individuals." Regarding these individuals:

> The impact of an RFC for less than a full range of sedentary work is especially critical for individuals who have not yet attained age 50. Since age, education, and work experience are not usually significant factors in limiting the ability of individuals under age 50 to make an adjustment to other work, the conclusion whether such individuals who are limited to less than the full range of sedentary work are disabled will depend primarily on the nature and extent of their functional limitations and restrictions.

SSR 96-9p, 1996 WL 374185.

### C. The Treating Physician Rule

Under the treating physician rule, the ALJ must give "controlling weight" to the opinion of a claimant's treating physician as to the nature and severity of the impairment as long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotation marks and citation omitted). "However, the ALJ may set aside the opinion of a treating physician that is contradicted by the weight of other record evidence." *Smith v. Berryhill*, No. 17-2005, 2018 WL 3202766, at *2 (2d Cir. June 29, 2018) (summary order) (citing *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)). "A treating physician's opinion may also be rejected if it is internally inconsistent or otherwise uninformative." *Id.* (citing *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)).

Before an ALJ can give a treating physician's opinion less than controlling weight, the ALJ should consider the following factors to determine the amount of weight the opinion should be given:

> (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical support for the treating physician's opinion, (4) the consistency of the opinion with the record as a whole, (5) the physician's level of specialization in the area, and (6) other factors that tend to support or contradict the opinion.

*Gonzalez v. Comm'r of Soc. Sec.*, Case No. 16-CV-08445 (KMK) (PED), 2017 WL 7310391, at *11-12 (S.D.N.Y. Dec. 21, 2017), *report and recommendation adopted*, 2018 WL 671261 (S.D.N.Y. Jan. 31, 2018) (citing 20 C.F.R. § 416.927(c)(2)-(6)) (additional citation omitted). While the ALJ need not expressly address each factor, the ALJ must provide "good reasons" for the weight accorded to the treating physician's opinion. *See Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order); *see also* 20 C.F.R. § 416.927 (stating that the agency "will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion.").

An ALJ is not required to give controlling weight to conclusory statements about whether a claimant is disabled, as issues of whether a claimant is disabled are reserved for the Commissioner. SSR 96-5p; *see also Donnelly v. Barnhart*, 105 Fed. App'x 306, 308 (2d Cir. 2004) (ALJ "properly discounted" portions of doctors' opinions which made conclusory statements as to whether plaintiff was disabled).

### D. Credibility

When determining a claimant's RFC, the ALJ is required to consider the claimant's reports of pain and other limitations, 20 C.F.R. § 416.929, but is not required to accept the claimant's

subjective complaints without question. "It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983). The ALJ has discretion to weigh the credibility of the claimant's testimony in light of the medical findings and other evidence in the record. *McLaughlin v. Sec'y of Health, Educ. & Welfare*, 612 F.2d 701, 704-05 (2d Cir. 1980).

The Social Security Regulations provide a two-step process for the ALJ to follow when evaluating a claimant's credibility. First, the ALJ must determine whether there are "medically determinable physical or mental impairment(s)—*i.e.*, impairment(s) shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce the individual's pain or other symptoms." *Mitchell v. Berryhill*, Case No. 15-CV-6595 (PED), 2018 WL 2465175, at *13 (S.D.N.Y. June 7, 2017) (quoting SSR 96-7p, 1996 WL 374186).[24] If this has been shown, the ALJ must then evaluate the intensity, persistence and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. SSR 96-7p, 1996 WL 374186. When making a credibility determination, the ALJ can consider the following factors:

---

[24] Effective on March 28, 2016, SSR 16-3p superseded SSR 96-7p. *See* 2016 SSR LEXIS 4. The new ruling eliminates the use of the term "credibility" from the SSA's sub-regulatory policy, in order to "clarify that subjective symptom evaluation is not an examination of an individual's character." *Id.* at *1. Instead, adjudicators are instructed to "consider all of the evidence in an individual's record when they evaluate the intensity and persistence of symptoms after they find that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms." *Id.* at *2. Both the two-step process for evaluating an individual's symptoms and the factors used to evaluate the intensity, persistence and limiting effects of an individual's symptoms remain consistent between the two rulings. *Compare* SSR 96-7p *with* SSR 16-3p. As the ALJ's decision in this matter was issued before the new regulation went into effect, this Court will review the ALJ's credibility assessment under the earlier regulation, SSR 96-7p.

(1) daily activities; (2) the location, duration, frequency, and intensity of the pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms.

*Mitchell*, 2018 WL 2465175, at *13 (citing 20 C.F.R. § 416.929(c)(3)). In addition to this two-step process, the ALJ must explain their decision to reject a claimant's testimony "with sufficient specificity to enable the [reviewing] Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence." *Duran v. Colvin*, Case No. 14-CV-8677, 2016 WL 5369481, at *13 (S.D.N.Y. Sept. 26, 2016).

Ultimately, the ALJ's determination of credibility is entitled to deference. *See Snell*, 177 F.3d at 135-36 ("After all, the ALJ is in a better position to decide issues of credibility"). If after considering these factors the ALJ's findings "are supported by substantial evidence . . . the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain." *Aponte v. Sec'y, Dep't of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984).

### E. Vocational Expert Testimony

As previously noted, it is the Commissioner's burden to show that, based on the claimant's RFC, age, education and work experience, work "exists in significant numbers" in the national economy that the claimant could perform. 42 U.S.C. § 423(d)(2)(A). The Commissioner may satisfy this burden by relying on the expertise of a vocational expert. *Bapp v. Bowen*, 802 F.2d 601, 604-05 (2d Cir. 1986). An ALJ "properly relie[s]" on a vocational expert's opinion when the ALJ gives the vocational expert "a proper hypothetical based on the record evidence, a valid

credibility determination, and an accurate depiction of Plaintiff's physical limitations." *Mitchell v. Berryhill*, Case No. 15-CV-6595 (PED), 2017 WL 2465175, at *14 (S.D.N.Y. June 7, 2017).

### F. **Obesity**

Obesity is a medically determinable impairment to be considered in evaluating a claimant's RFC. Under the Social Security Regulations,

> [w]hen the evidence in a case does not include a diagnosis of obesity, but does include clinical notes or other medical records showing consistently high body weight or BMI . . . in most such cases we will use our judgment to establish the presence of obesity based on the medical findings and other evidence in the case record.

SSR 02-01p. "This does not mean, however, than an ALJ must always explicitly discuss a claimant's obesity in his or her RFC determination; rather, an ALJ's determination can reflect an appropriate consideration of obesity if it adopts the limitations suggested by physicians who have directly considered the effects of obesity in their opinions." *Wilson v. Colvin*, Case No. 14-CV-5666 (DF), 2015 WL 5786451, at *30 (S.D.N.Y. Sept. 29, 2015).

The Second Circuit and courts in this district have found that, even when the ALJ fails to mention obesity in the ALJ's decision, an ALJ sufficiently has considered a claimant's obesity when the record includes medical opinions from doctors who were aware of the claimant's obesity. *See Drake v. Astrue*, 443 F. App'x 653, 657 (2d Cir. 2011) (finding that district court implicitly factored claimant's obesity into RFC determination by relying on medical reports that repeatedly noted obesity and provided overall assessment of work-related limitations); *see also Talavera v. Astrue*, 500 F. App'x 9, 12 (2d Cir. 2012); *Watson v. Astrue*, No. 08-CV-1523, 2010 WL 1645060, at *4-5 (S.D.N.Y. Apr. 22, 2010).

## II.    Analysis

On appeal, Hill contends that ALJ McCormack's decision is the product of legal error because: (1) the ALJ did not adequately incorporate consultative examiner Dr. Pelczar-Wissner's opinion into the RFC determination; (2) the ALJ erred in affording little weight to treating physician Dr. Khalil; (3) the ALJ failed to consider Hill's obesity; (4) the ALJ's RFC determination was not supported by substantial evidence; and (5) the ALJ improperly found against Plaintiff's credibility. (Pl.'s Mem. of Law., ECF No. 16-1 at 7-11; Am. Compl. at 2-3.) The Commissioner responds that the ALJ's decision is free of legal error and supported by substantial evidence. (Def.'s Mem. of Law at 1.) The Court finds that the ALJ's decision is legally correct and supported by substantial evidence.

### A.    The ALJ's RFC Determination Is Supported By Substantial Evidence

Hill challenges ALJ McCormack's RFC determination; specifically, she challenges the ALJ's assignment of weight afforded to consultative examiner Dr. Pelczar-Wissner, and to Hill's treating physician, Dr. Khalil.

### 1.    Weight Given To Consultative Examiner, Dr. Pelczar-Wissner

Hill argues that, despite purporting to give it significant weight, the ALJ did not adequately consider Dr. Pelczar-Wissner's opinion, because Dr. Pelczar-Wissner's statements support a finding of disability, rather than a less-than-sedentary RFC determination. (Pl.'s Mem. of Law at 7-9.) Specifically, Hill argues that Dr. Pelczar-Wissner's opinion that Hill's ability to sit, stand, walk, and so on is seriously limited means that Hill is precluded from the sitting, standing and walking requirements of sedentary work. (*Id.* at 8.) The Commissioner argues that the ALJ's assessment of Dr. Pelczar-Wissner's limitations for Hill are consistent with the RFC determination of

sedentary work. (Def.'s Mem. of Law at 14-16.) In her Reply, Hill reiterated that Dr. Pelczar-Wissner's opinion evidence supported her claims of disability. (Pl.'s Reply, ECF No. 23, at 1-2.)

Hill's argument is not persuasive. ALJ McCormack's RFC determination provides for limitations on sitting, standing and walking by stating that "she cannot climb ladders, ropes or scaffolds or crawl" and limiting to an occasional basis Hill's ability to "push/pull, climb ramps and stairs, balance, stoop, kneel and crouch on an occasional basis." (R. 17.) Although Dr. Pelczar-Wissner does note that Hill has "marked restriction for exertional activities," nothing in Dr. Pelczar-Wissner's opinion precludes Hill from walking and standing for up to two hours a day, or sitting for six hours per day as required by sedentary work. 20 C.F.R. § 416.967; SSR 96-9p. Thus, the Court finds that the ALJ adequately considered Dr. Pelczar-Wissner's opinions in arriving at the RFC determination.

### 2. Assessment Of Treating Physician, Dr. Khalil

The ALJ gave "[l]ittle weight" (R. 19) to the opinions of Hill's treating physician, Dr. Khalil, which Hill challenges. Hill argues that Dr. Khalil's opinion evidence was consistent with the medical record evidence and the opinion of Dr. Pelczar-Wissner, and therefore should have been given controlling weight. (Pl.'s Mem. of Law at 10.) The Commissioner argues that Dr. Khalil's findings "were unsupported by and inconsistent with his own . . . examination findings," and therefore were not entitled to controlling weight. (Def.'s Mem. of Law at 19.)

Even though Dr. Khalil was Hill's treating physician, the Court finds that the ALJ was entitled to give Dr. Khalil's opinion evidence less than controlling weight. ALJ McCormack noted that Dr. Khalil's opinions were "based in large measure upon the claimant's own subjective complaints," rather than his own observations. (R. 19.) More significantly, ALJ McCormack found

that "Dr. Khalil's opinions are also inconsistent with his examinations of the claimant, which showed minimal findings." (*Id.*) Dr. Khalil found that Hill would need to lie down during an eight-hour workday; that her symptoms would frequently or constantly be severe enough to interfere with attention and concentration; that she could only stand/walk for ten minutes at one time for a total of one hour per day; that she would need to take frequent five-minute breaks; that she would be absent from work four days or more per month; and that she could not work eight hours per day five days per week. (R. 255-56, 268-69.) However, his treatment records do not reflect such limitations. Indeed, some treatment records do not mention at all the severe conditions of her asthma, hypertension or heart condition. (*See, e.g.*, R. 285.) These reasons, which were mentioned by ALJ McCormack as explanations for why he did not give Dr. Khalil's opinions controlling weight, were valid reasons for the weight given. Therefore, the ALJ was entitled to give less than controlling weight to the opinions of Dr. Khalil.

The Court notes, however, that the ALJ may have committed error when he determined that Dr. Khalil did not have an adequate longitudinal basis for making his opinion as treating physician.[25] Although Dr. Khalil said that he first started treating Hill in July 2012, ALJ McCormack found that, according to the medical record evidence, Dr. Khalil did not start seeing Hill until December 2013. (R. 19.) ALJ McCormack's finding may have been based on the fact that the physician signatures on some of the earlier records from Broadway Medical Services (where Hill frequently saw Dr. Khalil) were illegible (*see, e.g.*, R. 284, 286), therefore leading the ALJ to believe that she had not seen Dr. Khalil during those earlier visits. However, the record shows

---

[25] Since Hill herself did not raise this issue in her briefing, it is possible that the ALJ's longitudinal assessment of the time period Dr. Khalil treated Hill was correct.

that Hill began visiting Broadway Medical Services in July 2012 and Hill frequently saw Dr. Khalil during those visits. (*See* R. 309-24 (treatment notes of Dr. Khalil corresponding to treatment notes from Broadway Medical Services).) Thus, it is entirely possible that Hill began seeing Dr. Khalil at Broadway Medical Services beginning in July 2012. Nevertheless, because the ALJ provided other good reasons for giving Dr. Khalil's opinions less than controlling weight, the Court finds this to be harmless error. *See Matta v. Astrue*, 508 F. App'x 53, 57 (2d Cir. 2013) (harmless error when ALJ discounts treating physician but provides sufficient reasons for doing so).

The ALJ adequately incorporated Dr. Pelczar-Wissner's findings into his RFC, and gave good reasons for giving Dr. Khalil's opinions less than controlling weight. Thus, the RFC was supported by substantial evidence, and remand is not available on the basis of any challenge to ALJ McCormack's RFC determination.

### B. The ALJ Did Not Err By Omitting Mention Of Hill's Obesity

Hill argues that ALJ McCormack erred by failing to mention or consider her obesity when making the RFC determination. (Pl.'s Mem. of Law at 10-11.) The Commissioner argues that the ALJ's consideration of medical record evidence which mentioned Hill's obesity was adequate, and further that Hill "points to nothing in the record evidencing that her obesity caused additional limitations that exceeded the nominal exertional demands of sedentary work." (Def.'s Mem. of Law at 22-23.)

Hill's BMI was listed on numerous records from Broadway Medical Services; her BMI was usually in the range of 30-30.5.[26] (*See, e.g.*, R. 273-80.) The Court already has concluded that

---

[26] According to SSR 02-01p, a BMI greater than 30 is considered obese. The record contains at least one instance when her BMI was listed higher than the 30-30.5 range stated above. (*See, e.g.*, R. 274 (listing a

substantial evidence supports the ALJ's determination of Hill's RFC. Thus, because the ALJ

considered the medical record evidence, which listed Hill's BMI, when determining Hill's RFC, and

because Hill points to nothing in the record demonstrating that her obesity caused limitations in

excess of those provided in the RFC, she has not met her burden of proof with respect to obesity-

related limitations, nor established that any purported error in evaluating obesity harmed her in

any way. *Martin v. Astrue*, 337 F. App'x 87, 89 (2d Cir. 2009) (ALJ did not erroneously fail to

acknowledge claimant's obesity when obesity was mentioned in medical records and no evidence

was provided that it limited work ability). Thus, the Court finds that remand is not warranted on

this basis.

### C.   The ALJ's Credibility Determination Was Not In Error[27]

Hill argues the ALJ erred by improperly finding against her credibility when

"overwhelming medical evidence supports her claims." (Am. Compl. ¶ 16.) This argument is

unpersuasive.

ALJ McCormack properly rejected Hill's testimony because it was unsupported by the

record. The ALJ engaged in the two-step process required to evaluate a claimant's credibility.

After finding at step one that the medical record evidence revealed impairments that could have

reasonably caused Hill's alleged symptoms, ALJ McCormack then considered the requisite factors

in step two to assess whether the symptoms were of such intensity, frequency or duration as to

preclude substantial gainful activity. (R. 18-19.) For example, ALJ McCormack considered Hill's

---

BMI of 33).) The record also contains at least one instance when her BMI was listed at 27.4, below the
level of obesity. (R. 311.)

[27] Although Hill did not discuss this issue in the memorandum of law in support of her motion, she did
raise it in her amended complaint, so the Court addresses it now.

own statements about her limitations and her daily activities—*e.g.*, that she could cook, shop, use the computer and care for personal needs, as well as socialize, pay her bills and use public transportation. (*Id.*) In addition, ALJ McCormack considered that, since Hill's mitral valve replacement surgery: (1) "there has been no history of any further hospitalizations, surgery or emergency room treatment;" (2) Hill's physical examinations following her surgery were essentially "normal;" and (3) Hill's hypertension and asthma are controlled with medications. (R. 19.) These findings are consistent with the medical record evidence. Lastly, the ALJ did give some consideration to Hill's subjective complaints. (R. 18.) In light of the foregoing, the ALJ's credibility determination was supported by substantial evidence and I decline to disturb the credibility finding on this record.

### D.  <u>The ALJ's Step Five Determination Is Supported By Substantial Evidence</u>[28]

Hill argues that ALJ McCormack's Step Five determination was unsupported by substantial evidence, on the basis that the testimony the ALJ relied upon from vocational expert Feldman was in response to an unsupported, incomplete hypothetical question. (Am. Compl. ¶ 17.)

As previously discussed, the ALJ's RFC determination was supported by substantial evidence. Therefore, when the ALJ gave Feldman three hypotheticals based on Hill's RFC, those hypotheticals were properly based on the record evidence, a valid credibility determination and an accurate depiction of Hill's physical limitations, age and education level. Moreover, ALJ McCormack asked numerous, thorough follow-up questions raised by Feldman's responses to those hypotheticals to clarify his understanding of Feldman's testimony. This is especially true

---

[28] Although Hill did not challenge the ALJ's Step Five determination in the memorandum of law in support of her motion, she raised the issue in her amended complaint, so the Court addresses this claim now.

regarding portions of Feldman's testimony which ALJ McCormack initially found inconsistent and confusing; ALJ McCormack's follow-up questions allowed the vocational expert to clarify the types of positions available to an employee with certain limitations at the light and sedentary levels. (R. 64-74.) Moreover, ALJ McCormack found that Feldman's testimony was consistent with the Dictionary of Occupational Titles. (R. 20-21.) Accordingly, the ALJ properly relied on Feldman's opinion as a vocational expert in his Step Five analysis, and remand on the basis that his reliance was improper is unavailable.

## CONCLUSION

The Court has considered Hill's remaining arguments and finds they have no merit. For the preceding reasons, the Court DENIES Hill's motion and GRANTS the Commissioner's motion. The Clerk of Court is directed to terminate the pending motion at ECF No. 16, to terminate as GRANTED the motion at ECF No. 21, and to close this case.

DATED:      September 18, 2018
              New York, New York

**STEWART D. AARON**
**United States Magistrate Judge**